IN THE UNITED STATES DISTRICT COURT
WESTERN DISTRICT OF VIRGINIA
CHARLOTTESVILLE DIVISION

| | | |
|---|---|---|
| BRYCE DOWNIE, | ) | CASE NO. 3:05CV00021 |
| | ) | |
| Plaintiff, | ) | |
| | ) | |
| v. | ) | REPORT AND RECOMMENDATION |
| | ) | |
| REVCO DISCOUNT DRUGS | ) | |
| CENTERS, INC., et al., | ) | |
| | ) | By:   B. WAUGH CRIGLER |
| Defendants. | ) | U.S. MAGISTRATE JUDGE |

Before the court are the parties' cross motions for summary judgment and defendant's

two motions to strike.  The motions have been referred to the undersigned under the authority of

28 U.S.C. § 636(b)(1)(B) to render to the presiding District Judge a report setting forth findings,

conclusions and recommendations for its disposition.  For the reasons that follow, the

undersigned will RECOMMEND that an order enter GRANTING defendant's motion to strike

the evidence of James L. Wilt while DENYING, as moot, the motion to strike the evidence of

Liza L. Gould, M.D., GRANTING defendant's motion for summary judgment on all counts in the

plaintiff's complaint and DISMISSING this action from the docket of the court.

## PARTIES AND CLAIMS

Bryce Downie filed this action against Revco Discount Drug Centers, Inc.[1] (hereinafter

"Revco," "CVS" or "defendant")[2] alleging, in Count I, that defendant wrongfully terminated him,

---

[1] In the parties' pleadings and in testimony from witnesses, "Revco" and "CVS" are used
interchangeably.  It is undisputed that both names refer to defendant.  (Dkt. No. 101, p. 4.)

[2] ChoicePoint Information Services, Inc. was named as a defendant but plaintiff and
ChoicePoint entered into a settlement agreement which included dismissal of plaintiff's claims
against ChoicePoint.  (Dkt. No. 49.)

in violation of the Americans With Disabilities Act of 1990, 42 U.S.C. § 12131 et seq. Plaintiff alleges in Count Two that defendant breached confidentiality regarding his disability and medical information in violation of the Americans With Disabilities Act of 1990, 42 U.S.C. § 12112(d) et seq. In Count Three, plaintiff alleges that defendant violated his rights under the Fair Credit Reporting Act, 15 U.S.C. § 1681 et seq. In Count Four plaintiff claims defendant violated his rights under the Virginians With Disabilities Act, Va. Code § 51.5-1 et seq., and, in Count Five, plaintiff seeks injunctive relief preventing defendant from publishing what he alleges is false and misleading information about his employment with Revco. In support of these claims, the complaint sets forth detailed factual assertions which will be more fully discussed below.

## BACKGROUND

The undersigned has difficulty discerning from the parties' "undisputed facts" whether they agree on much of anything, though the extant record reveals quite a bit of historical information which does not appear disputed. With this in mind, the undersigned will recite what appears not to be controverted, and where there is a dispute, so signify.

Plaintiff began working at the CVS store located in Locust Grove, Virginia as a sales clerk or customer service representative on or about May 11, 2003[3]. On February 29, 2004, plaintiff was promoted to the full-time position of pharmacy technician. (Pl's Deposition, pp. 84, 87.)

Plaintiff is a diagnosed epileptic, and his condition precludes him from driving a car or taking a bath without the presence of another person. (Dkt. No. 106, p. 5.) Plaintiff testified

---

[3]The parties have provided the court with several inconsistent dates regarding when plaintiff's employment with CVS commenced. However, the precise date is not material to the outcome of the case.

2

that, although he generally lived on his own, he often would stay with his parents during times when his medications were being altered and he was experiencing adverse side effects, or when he was experiencing excessive adverse effects of his condition. (Pl's Deposition, p. 445.) Plaintiff testified that during the time period when he was working at CVS as a pharmacy technician, he was living with his parents. (Pl's Deposition, p. 89.) Plaintiff has conceded that his epilepsy did not impair his ability to work or his overall job performance at CVS. (Dkt. No. 101, Ex. A, part 8, p. 6.) Plaintiff openly shared with his coworkers and the CVS management that he had epilepsy, yet he never requested an accommodation. (Pl's Deposition, pp. 54, 81, 83.) At the hearing, plaintiff argued that he requested a reasonable accommodation in that he asked for his disability be taken into consideration when he was terminated.

Generally, plaintiff had his prescription medications for epilepsy filled either at the Locust Grove CVS pharmacy or by a CVS mail-order pharmacy. On April 12, 2004, plaintiff presented two of his prescriptions at the Locust Grove pharmacy to be refilled. The pharmacy did not have enough of each to provide complete refills, so the pharmacist partially filled both prescriptions. The prescriptions were placed in the "waiting bin" for pick-up.[4] In the meantime, plaintiff presented a third prescription to be filled.

When plaintiff sought to check out the third prescription on April 16, 2004 at 7:01 p.m., all three prescriptions were in the bag. (Pl's Deposition, pp. 117-118.) The cashier then checked plaintiff out for a purchase of two bags of M&M's with only one prescription copay in the amount of $20, totaling $21.92 including the tax on the candy. (Pl's Deposition, pp. 118, 121.)

---

[4]A "waiting bin" simply is a bin or drawer sorted alphabetically which holds a customer's prescription between the time it is filled and picked up.

Plaintiff wrote a check for that amount. (Pl's Deposition, p. 121.) Plaintiff testified that later that evening when he got home, he discovered that the prescription bag he had taken from the store contained three medications. (Pl's Deposition, p. 124.)

Having been familiar with the store's checkout policies, plaintiff believes that, when the cashier rang up the sale, she scanned only the top label on the bag though there were three prescription medications and three labels. (Pl's Deposition, p. 122.) Moreover, plaintiff testified that when he checked out, he believed he was paying for all the prescriptions in the bag. (Pl's Deposition, pp. 123-124, 129.) Plaintiff further offered that the medications he was taking at the time caused him to experience "memory difficulties." (Pl's Deposition, pp. 122-23.) Plaintiff also testified that he never would have "intentionally" taken anything from the store without paying for it. (Pl's Deposition, p. 130.)

Dustie Wisor, the lead pharmacy technician, was reviewing the pharmacy's "waiting bin" report when she discovered that plaintiff had taken delivery of two prescriptions that were neither in the bin nor paid for. Plaintiff's deposition reveals that, on or about April 28, 2004, Wisor informed plaintiff that two prescriptions were listed for him on the waiting bin report, but that neither was in the waiting bin. (Pl's Deposition, pp. 126-27.) Wisor asked plaintiff whether he had the two prescriptions, and if so, whether he had paid for them. Plaintiff admitted to her that he had taken the two prescriptions home, but, believing he had paid for them, he asked Wisor for time to check his records for a receipt. (Pl's Deposition, p. 127.) A day or so later, Wisor again confronted plaintiff and asked him whether he had found the receipt that would show he had paid for the two prescriptions, which plaintiff answered in the negative and indicated he was still looking. (Pl's Deposition, p. 128.)

4

Plaintiff revealed that he specifically approached Wisor later as a follow up, at which time, he informed her that he still was in the process of reviewing his financial records and prescription labels in an effort to show that he had paid for the prescriptions. He further explained to Wisor that, in light of the number of prescriptions he used on a monthly basis, the task would take him some period of time to complete. (Pl's Deposition, p. 129.)

The matter regarding plaintiff's two prescriptions was brought to the attention of Kim Dowell, the Store Manager.[5] Plaintiff testified that he also went to Dowell to explain the situation. (Pl's Deposition, pp. 131-32.) On or about April 28, 2004, Dowell contacted John Struder, the Regional Loss Prevention Manager, and informed him about the situation.[6]

On May 5, 2004, Struder visited the store and met with both Dowell and the plaintiff. During the meeting, plaintiff reiterated his belief that he had paid for the two prescriptions, and revealed that one of the medications must have caused him to become disoriented.[7] Dowell testified that prior to their meeting with plaintiff, she had informed Struder that plaintiff had seizures. (Kim Dowell's Deposition, p. 31.) Plaintiff testified that he informed Struder that his checkbook likely would confirm his payment for the prescriptions, but that he did not have the checkbook with him at work. (Pl's Deposition, p. 139.)

---

[5] Dowell testified that although she primarily works in the front end of the store, she is ultimately in charge of the pharmacy as well. (Dowell's Deposition, p. 35.)

[6] There is no dispute that CVS' policy required a store manager to contact loss prevention when an incident like this arose. All decisions about the employee then were to be handled by CVS management or supervisory personnel at a higher level than the store manager.

[7] Plaintiff's evidence is that in April 2004 his treating doctor adjusted his medication for epilepsy by adding a medicine known to cause "mental confusion; increased difficulty in concentration." (Dkt. No. 106, p. 4.) However, plaintiff's father testified that just prior to his termination plaintiff's seizure activity was down. (Louis Downie's Deposition, p. 88.)

5

Dowell then drove plaintiff to his home so he could obtain his checkbook register.[8] (Dowell's Deposition, p. 30.) Plaintiff brought his checkbook register back to the store but was unable to produce any evidence that he had paid for the two prescriptions. (Dowell's Deposition, p. 31.) Plaintiff testified that at that point he became very upset because, for the first time, he realized he had not paid for the prescriptions. (Pl's Deposition, pp. 142-43.) Defendant believes the evidence shows that plaintiff knew he had not paid for the prescriptions when he was confronted by Wisor on April 28, 2004. (Dkt. No. 112, p. 7.)

Plaintiff testified that, after acknowledging he had not paid for the prescriptions, Struder asked him whether he was willing to provide a statement. (Pl's Deposition, p. 143.) Plaintiff did so without feeling pressured, and his responses were provided in his own words. (Pl's Deposition, pp. 145-46.) Plaintiff's "Statement" took the form of questions written by Struder with accompanying handwritten answers. The statement is as follows:

> [Struder] On 4-13-04 you had two prescriptions filled, Lamictal #292057 and Topamax #311774. These prescriptions showed upon (sic) the waiting bin report but could not be found in the waiting bin. What happened to these prescriptions?
>
> [Plaintiff] At that time, I was in the process of increasing my Lamictal levels. The increase caused me to experience side-effects. One of them is disorientation and concentration. I thought I had paid for the prescriptions. I did not intentionally take them without paying.
>
> [Struder] When did you realize that you had not paid for these prescriptions?
>
> [Plaintiff] I was confronted by the pharmacy's lead technician, Dustie Wisor.
>
> [Struder] When did you and Dustie talk?

_____

[8]Plaintiff testified that he did not remember Dowell driving him to his home to retrieve his checkbook. (Pl's Deposition, p. 141.) However, plaintiff's undisputed facts concede that Dowell did so. (Dkt. No. 106, p. 6.)

6

[Plaintiff] During the period of the April 28th.

[Struder] When we started talking today, why did you initially tell me you had paid for these prescriptions?

[Plaintiff] Because I referred to [my] checkbook register and it showed me writing several checks to 'CVS Pharmacy.'

[Struder] Are you willing to pay for the prescriptions you took which is a total of $40.00?

[Plaintiff] YES!!!!

(Dkt. No. 106, Ex. 19.)

Plaintiff testified that after he provided this statement, he was asked to wait outside, which he did for approximately an hour. (Pl's Deposition, p. 147.) During this interval, Struder concluded that plaintiff intentionally had taken the prescriptions because of the 2 ½ week delay in paying for them after he was notified, and he contacted Gordon Hair, the Pharmacy Supervisor.[9] (Dkt. No. 101, p. 10.) Hair testified that he did not remember being provided with direct information concerning plaintiff's epilepsy, only the information relating to the incident, and, based on those facts, Hair concluded that plaintiff had committed a "gross violation" of company policy which necessitated discharge. (Hair's Deposition, pp. 28-29.) Before making his decision, Hair testified that he contacted his superior to discuss the matter. (Hair's Deposition, p. 14.) Dowell testified that she agreed with Hair's decision. (Dowell's Deposition, pp. 34-35.) Plaintiff testified that Dowell later confirmed that, after consulting with the district

---

[9]The depositions do not settle the exact position Hair held in the CVS organization during the relevant time period. Plaintiff, therefore, argues that there is a "issue of fact" surrounding who actually terminated plaintiff's employment. (Dkt. No. 111, p. 10.) However, the precise position held is not material to the outcome of the case.

7

manager, there was no option but to terminate him.[10] (Pl's Deposition, p. 151.) Dowell testified that Hair's direction to terminate plaintiff was "the right decision." (Dowell's Deposition, pp. 34-35.) According to plaintiff, however, Dowell informed him, and later his mother, that she was "shocked" at the decision to terminate him, that she did not believe plaintiff intended to take the medicine without paying for it, that he "did not have to be fired," and that she knew that "it (presumably his failure to pay for the two prescriptions) was dealing with [his] epilepsy." (Pl's Deposition, pp. 155, 287.) Plaintiff's evidence is that Dowell informed his rehabilitation counselor that she "really believe[d] what happened was disability related." (Dkt. No. 114, Ex. A, p. 1.) Plaintiff admitted he was well aware of a CVS company policy which prohibited employees from removing items from the store without paying for them first. (Pl's Deposition, pp. 59-61.)

According to plaintiff, he had reported employees that had violated CVS policies by using store merchandise prior to paying for it, yet no action ever was taken against these employees. (Pl's Deposition, pp. 245-250.) Plaintiff contends that the evidence adduced during discovery shows that, in other cases where the cashier mistakenly failed to ring up all of the prescriptions, the cashier was terminated. According to plaintiff, shrinkage reports from the Locust Grove store support a finding that shrinkage was a major issue at the store, yet rather than addressing the bigger problem, defendant chose to focus solely on him. (Dkt. No. 111, p. 9)

According to plaintiff, Struder's investigative report in his case is uncharacteristically

---

[10]At the argument before the undersigned, plaintiff suggested that each individual involved with plaintiff's termination had attempted to "pass the buck" to avoid any personal liability for the decision. Notwithstanding, plaintiff has not contested the existence of a Revco policy which removed decisions like this from local store managers or loss prevention managers and placed them in the hands of personnel in a corporate district office.

8

more detailed than other employee theft reports produced by him. (Dkt. No. 114, Ex. B.) Defendant's evidence reveals that Struder has listed drug names in other loss prevention reports involving CVS employees who took prescription drugs. (Dkt. No. 118, Ex. U, pp. 2-3.)

After his termination, plaintiff received a Cobra notice from Benefit One, the vendor which handled Cobra benefits coverage for CVS. The notice did not include a statement of plaintiff's pharmacy benefits. Plaintiff has alleged that the failure to include the notice in his benefits notice was intentional. Defendant has provided unrebutted testimony from a CVS employee who handles employee benefits that the failure to include the pharmacy coverage information in plaintiff's Cobra notice was purely an administrative error. (Shellene Greenwood's Deposition, p. 31.) Defendant's evidence further shows that plaintiff's mother contacted Benefit One about the matter, the situation was corrected, and plaintiff received a corrected Cobra notice which showed that he was entitled to pharmacy benefits. (Greenwood's Deposition, p. 19.) Plaintiff does not claim that he actually was denied prescription coverage under Cobra.

Defendant referred plaintiff's name to Retail Enterprises, a collection agency, to determine whether civil recovery for non-payment of the prescriptions was appropriate. It was determined that civil recovery was in order, and the case was referred to attorney Steven J. Tassinari, who sent plaintiff a demand letter dated May 14, 2004. (Dkt. No. 106, Ex. 26.) Plaintiff contends that there is an issue of fact as to whether the signed admission statement was provided to Retail Enterprises and Tassinari. (Dkt. No. 117, pp. 1-5.) Defendant's evidence reveals that the actual statement was not provided to Retail Enterprises or Tassinari. (John Roberts' Deposition, p. 47.) Plaintiff has offered no direct evidence to the contrary.

9

On July 6, 2004, CVS provided a statement to ChoicePoint Services, Inc. informing the company that plaintiff had been terminated from CVS for theft of drugs. ChoicePoint is a consumer reporting agency which engages in the practice of assembling and evaluating consumer credit information in its Esteem Database for the sole purpose of providing consumer reports to third parties, including prospective employers. (Dkt. No. 101, Ex.1.) CVS purchased credit reports from ChoicePoint and provided information to ChoicePoint for use in making credit reports. (Dkt. No. 16, p. 4.)

In June 2004, plaintiff applied for a job with Rite-Aid but was not hired. In July 2004, plaintiff was hired by Costco, but he was terminated shortly thereafter. (Pl's Deposition, p. 219.) In September 2004, plaintiff applied for a position as a salesperson at Lowe's Home Improvement. Prior to hiring him, Lowe's requested a report from ChoicePoint about plaintiff. As a consequence of the Lowe's request, ChoicePoint sought from CVS a copy of plaintiff's verified admission statement on September 14, 2004. (Dkt. No. 114, Ex. D, pp. 2-3.) On September 21, 2004, CVS provided ChoicePoint with a copy of plaintiff's statement. (Dkt. No. 114, Ex. D, p. 3.) ChoicePoint provided Lowe's with a consumer report which revealed that plaintiff had made an admission statement relating to his taking drugs without first paying for them. Plaintiff received a letter from ChoicePoint on behalf of Lowe's dated September 27, 2004, which stated that information it had received from ChoicePoint could adversely affect his employment status. The letter further informed plaintiff that he had the right to dispute with ChoicePoint the accuracy or completeness of the information contained in the consumer report. Attached to this letter was a copy of ChoicePoint's consumer report and a document which apprised plaintiff of his right to dispute under the Fair Credit Reporting Act. (Dkt. No. 101, Ex.

10

A, part 7, p. 18; Dkt. No. 114, Ex. D, p. 114.)  Plaintiff received a second letter from ChoicePoint dated September 29, 2004, which stated that Lowe's had declined to hire him based, at least in part, on the information received in the consumer report provided by ChoicePoint.  (Dkt. No. 101, Ex. A, part 9, p. 2; Dkt. No. 114, Ex. D, p. 4.)

Defendant has submitted evidence to show that ChoicePoint did not provide Lowe's with an actual copy of plaintiff's admission statement, and that plaintiff has never disputed the accuracy or completeness of his admission statement.  (Dan Wagner's Declaration, pp. 1-2.)  Defendant's evidence also shows that ChoicePoint did not provide defendant with formal notice that a dispute existed.  (Wagner's Declaration, p. 2; James Lynch's Deposition, p. 13.)  Plaintiff's evidence shows that on November 29, 2004 his counsel sent a fax to ChoicePoint to notify them of a dispute.  (Dkt. No. 114, Ex. D, p. 4.)  There appears to be no dispute in the evidence that ChoicePoint, in turn, failed to advise CVS that plaintiff had raised concerns or disputed the completeness or accuracy of the information CVS had provided to ChoicePoint.  (Dkt. No. 101, p. 13.)

On October 6, 2004, plaintiff filed a charge of disability discrimination with the Equal Employment Opportunity Commission (EEOC).  (Dkt. No. 101, Ex. A, part 8, pp. 4-9.)  In the charge, Plaintiff alleged that he had suffered discrimination and had been discharged in violation of the ADA and VDA.  He alleged that CVS' motivations for terminating him were discriminatory, and that the company did not take into account the impact of his medications on his conduct when it decided to terminate him.  (Dkt. No. 101, Ex. A, part 8, pp. 4-9.)  On March 31, 2005, at plaintiff's request, the EEOC issued a right to sue letter and terminated its investigation of plaintiff's charge.  (Dkt. No. 101, Ex. N.) In October 2004, plaintiff began

11

working as a pharmacy technician at Mary Washington Hospital Center.

In addition to the historical facts, plaintiff has provided the court with what he suggests is relevant and material evidence from a loss prevention expert, James L. Wilt. Wilt has opined that CVS employees did not perform a loss prevention investigation that met industry standards, and that it failed to acknowledge the large amount of loss from the pharmacy. Wilt believes this demonstrates that plaintiff's termination was unrelated to the two prescriptions for which he did not pay. (Dkt. No. 114, p. 5.) Defendant points out that Wilt neither has been qualified nor has served as an expert on loss prevention. CVS also focuses on Wilt's concession that his opinions were based on historical factual material provided by plaintiff and his counsel. (James Wilt's Deposition, p. 68.)

Plaintiff has also submitted a report from Liza H. Gold, M.D, who performed a psychiatric evaluation for the purpose of ascertaining whether plaintiff's termination from CVS caused any psychological or psychiatric injury. Gold opined, *inter alia*, that plaintiff did suffer an exacerbation of his seizure disorder and anxiety and experienced onset of an episode of major depression as a proximate result of his termination. (Dkt. No. 106, Ex. 9.)

## LEGAL PRINCIPLES

### Summary Judgment Standard

Summary judgment should be granted if "the pleadings, depositions, answers to interrogatories, and admissions on file, together with affidavits, if any, show that there is no genuine issue as to any material fact and that the moving part[ies are] entitled to judgment as a matter of law." FED. R. Civ. P. 56(c); *Gresham v. Lumbermen's Mut. Cas. Co.*, 404 F.3d 253, 259-60 (4th Cir. 2005). The moving party bears the initial burden of proof that there is an

12

absence of any genuine issues of material fact. *Celotex Corp v. Catrett*, 477 U.S. 317, 322 (1986). An issue of fact is "material" if it might affect the outcome of the case, and an issue of fact is "genuine" when it could cause a rational trier of fact to find in favor of the nonmoving party. *Anderson v. Liberty*, 477 U.S. 242, 248 (1986). However, the moving party is entitled to summary judgment as a matter of law when the nonmoving party has not established the existence of an essential element to that party's case. *Celotex*, 477 U.S. at 323. In such a case, there are no genuine issues of material fact because there has been a complete failure to establish an essential element of the nonmoving party's case. *Id.* When determining whether there is an issue for trial, the court must draw any inferences from the underlying facts in a light most favorable to the non-moving party. *Matsushita Elec. Indus. Co., Ltd. v. Zenith Radio Corp.*, 475 U.S. 574, 587 (1986); *Perini Corp. v. Perini Constr., Inc.*, 915 F.2d 121, 123-24 (4th Cir. 1990).

### Americans With Disabilities Act ("ADA")

### ADA Discrimination Claim

Plaintiff has the burden of showing: (1) he is within the ADA's protected class; (2) he was discharged; (3) at the time of his discharge, he was performing his job at a level which met the employer's legitimate expectations; and (4) the circumstances under which he was discharged give rise to a reasonable inference of unlawful discrimination. *Haulbrook v. Michelin N. Am., Inc.*, 252 F.3d 696, 702 (4th Cir. 2001). An employee may show that he/she is within the ADA's protected class if the employee is "disabled." *Pollard v. High's of Baltimore, Inc.*, 281 F.3d 462, 467 (4th Cir. 2002). [11]

---

[11] An employee also can demonstrate a violation of the ADA by showing that an employer has regarded him/her as disabled. *Sutton*, 527 U.S. at 489. Plaintiff has not claimed before the EEOC or in the complaint filed in this action that defendant violated the ADA by regarding him

13

Determining whether a person is disabled under the ADA is an individualized inquiry to be decided by the court. *Sutton v. United Air Lines, Inc.,* 527 U.S. 471, 483 (1999); *Heiko v. Colombo*, 434 F.3d 249, 254 (4th Cir. 2006); *E.E.O.C. v. Sara Lee Corp.*, 237 F.3d 349, 352 (4th Cir. 2001) (noting that the case is distinguishable from *Otting v. J.C. Penney Co.*, 223 F.3d 704 (8th Cir. 2000)). Disability can be established if the evidence demonstrates, *inter alia*, that plaintiff suffers a physical or mental impairment which, even when mitigating measures are taken, "substantially limits one or more of [his] major life activities." 42 U.S.C. § 12102(2)(A); *Sutton*, 527 U.S. at 497; *Heiko.,* 434 F.3d at 254; *Sara Lee Corp.*, 237 F.3d at 352.[12] Although the phrase "major life activities," is not defined by the ADA, the term refers to those activities of central importance to daily life, such that the average person would be able to perform them with little or no difficulty. *Heiko*, 434 F.3d at 254-55. The EEOC defines major life activities as those "functions such as caring for oneself, performing manual tasks, walking, seeing, hearing, speaking, breathing, learning, and working." 29 C.F.R. § 1630.2(I); *Heiko*, 434 F.3d at 255.

If an employee is disabled under the ADA, the employer must make "reasonable accommodations," unless the employer can show that the accommodation would impose an undue hardship. 42 U.S.C. § 12112(b)(5)(A); *Sara Lee Corp.*, 237 F.3d at 353. However, the employer's provision of a reasonable accommodation does not require it to "abandon a legitimate and non-discriminatory company policy." *Sara Lee Corp.*, 237 F.3d at 353-354.

---

disabled.

[12]It is clear to the undersigned that where treatment modalities, medication or mitigating measures are taken which do correct the effects of the impairment, that impairment no longer is considered disabling. *See Sutton*, 527 U.S. at 482.

14

**ADA Confidentiality Claim**

The ADA prohibits an employer from making inquiries of an employee regarding whether he/she is an "individual with a disability or as to the nature or severity of the disability unless such examination or inquiry is shown to be job-related and consistent with business necessity." 42 U.S.C. § 12112(d)(4); *Porter v. U.S. Alumoweld Co., Inc.*, 125 F.3d 243, 246 (4th Cir. 1997).

**Jurisdiction of the Court and Scope of Judicial Action Under ADA**

Because the statute requires that a Title VII claim be initiated administratively, a plaintiff alleging Title VII discrimination must initially file an administrative charge with the EEOC. *Chacko v. Patuxent Institution*, 429 F.3d 505, 508 (4th Cir. 2005); *see* 42 U.S.C. § 2000e-5(e)(1). The court lacks subject matter jurisdiction, and a plaintiff is precluded from maintaining an action in the federal courts until he has fully exhausted an administrative process. *Chacko*, 429 F.3d at 509; *see* 42 U.S.C. § 2000e-5(b), (f)(1). The administrative process plays a critical role in any subsequent litigation because the claims in a federal action under Title VII cannot exceed the scope of the EEOC charge, or "'any charges that would naturally have arisen from an investigation thereof.'" *Chacko*, 429 F.3d at 509 (quoting *Dennis v. County of Fairfax*, 55 F.3d 151, 156 (4th Cir. 1995)). Though the courts are to construe a plaintiff's EEOC charges liberally, the factual allegations set forth in the administrative charge must correspond to those set forth in the federal action. *Id.*; *Albarado v. Bd. of Trs. Of Montgomery Cmty. Coll.*, 848 F.2d 457, 460 (4th Cir. 1988).

**Virginians With Disabilities Act**

A plaintiff's rights under the VDA are coextensive with those under the ADA. *Tyndall v.*

*National Educ. Centers,* Inc., 31 F.3d 209, 216 (4th Cir. 1994).

**Fair Credit Reporting Act ("FCRA")**

The undersigned has had considerable difficulty ascertaining the precise provisions of the

FCRA upon which plaintiff premises his FCRA claim. Construing the complaint broadly, the

undersigned will address his claim under both subsections (a) and (b) of 15 U.S.C. § 1681s-2.

Title 15 U.S.C. § 1681s-2(a) imposes a duty on a "furnisher" of credit information to

provide consumer reporting agencies with accurate information.[13] *Beattie v. National Credit*

*Financial Services Corp.*, 69 Fed. Appx. 585, 591 (4th Cir. 2003). Enforcement of § 1681s-2(a)

is delegated to certain state and federal officials and is not extended to private parties. 15 U.S.C. §

1681s-2(c) and (d); *Beattie*, 69 Fed. Appx. at 591. Therefore, there is no private right of action

for individuals under § 1681s-2(a). *Ayers v. Equifax Information Services*, 2003 WL 23142201

(E.D. Va. 2003) (unpublished).

On the other hand, 15 U.S.C. § 1681s-2(b)(1) imposes a duty on a furnisher of information

to conduct an investigation with respect to any disputes, report the results of that investigation to

the consumer reporting agency and then to modify, delete or block any information which was

"inaccurate or incomplete or [could not] be verified" after an investigation. *Johnson v. MBNA*

*America Bank, NA*, 357 F.3d 426, 429 (4th Cir. 2004). In order to establish a *prima facie* case of

---

[13]A furnisher is defined as a person who "regularly and in the ordinary course of business
furnishes information to one or more consumer reporting agencies about the person's
transactions or experiences with any consumer." 15 U.S.C. § 1681s-2(a)(2). Defendant
concedes that it is a "furnisher" under the FCRA. (Dkt. No. 102, p. 19.)

16

liability under Section 1681s-2(b), the plaintiff must show that the furnisher first received notice under 1681i(a)(2) and then failed to discharge the duties imposed by the statute. *Id.*

## CONTENTIONS OF THE PARTIES

### *Defendant's Motion Summary Judgment*

### ADA Discrimination Claim

#### *Defendant*

Defendant initially argues that plaintiff has failed to established a *prima facie* case. Defendant does not believe plaintiff has shown he has a "disability," as that term is used in the statute, because he has not shown that his epilepsy "substantially limits" his ability to perform major life activities. Defendant points out that plaintiff's only limitations relate to driving and bathing which the defendant does not believe rise to the level of affecting major life activities. Defendant relies on *Sara Lee Corp.*, 237 F.3d at 349, a case involving epilepsy, as compelling authority in support of its claim that plaintiff is not disabled. Defendant further contends that the facts in *Otting*, 223 F.3d at 704, are clearly distinguishable from the instant case.

Defendant further argues that plaintiff has failed to show he was meeting the legitimate expectations of his employer because of misconduct, from which his alleged disability does not insulate him. Specifically, defendant asserts that there are no genuine issues of material fact over plaintiff's taking two prescription medications without paying for them, and that this conduct violated company policy thus defeating the employer's legitimate expectations for its employees. Moreover, defendant suggests that whether plaintiff actually "stole" the prescriptions is not relevant, only that the defendant, by and through its employees, reasonably believed that he had

17

engaged in misconduct. In other words, the defendant contends the court does not sit as a substitute employer to redetermine the discipline of employees for violations of company policies.

On the facts of this case, defendant contends there was a legitimate basis to believe plaintiff stole the prescriptions not only because he eventually admitted to taking them without paying, but also because at least two weeks elapsed, giving plaintiff an opportunity to produce proof of purchase or make an attempt to pay for the two prescriptions before loss prevention personnel were brought onto the scene.

It is the defendant's position that the court must consider whether plaintiff has established a *prima facie* case before engaging in any pretext analysis. In that connection, defendant argues that plaintiff has failed to raise a reasonable inference of discrimination because he has failed to show he was treated disparately, i.e. that non-disabled employees in similar situations received more favorable treatment, and there has been no factual challenge to the existence of company policies which permit termination for employee misconduct, which itself is a legitimate, non-discriminatory reason. Defendant further takes the position that plaintiff's now-expressed subjective intent to pay for the prescriptions is not relevant to an outcome here, and that its decision to terminate should be upheld if there was a reasonable basis upon which CVS could believe that plaintiff engaged in misconduct (theft), irrespective of his underlying medical condition, disability or the nature of the items taken.

Moreover, defendant argues that plaintiff has failed to demonstrate that the person making the decision to terminate him, namely Hair, knew that he had epilepsy or that Hair, Struder, or Dowell had any disability-based discriminatory intent whatsoever. CVS suggests that it is

18

illogical to assert Dowell was attempting to discriminate against him because she had been the person to promote plaintiff to his position in the pharmacy a few months prior to his termination.

Finally, Defendant contends plaintiff's claim fails because he admitted during the course of discovery that he never requested a reasonable accommodation under the ADA.

*Plaintiff*

Plaintiff argues that his epilepsy substantially limits his ability to care for himself. Specifically, plaintiff contends that he cannot drive a car, is unable to take baths alone and has to live with his parents at times when his condition is exacerbated. He also argues that his epilepsy substantially limits his ability to think and concentrate, and that he suffers from memory loss and other limitations on his ability to think and concentrate either because of the disorder itself, or as a result of the medications he takes, or a combination of both.

Plaintiff takes the position that the evidence, when viewed in a light most favorably to him, cannot demonstrate as a matter of law that he was not meeting the defendant's work-related expectations because a reasonable trier of fact could conclude he did not engage in misconduct. Plaintiff suggests that misconduct required "deliberate" violations of company policies, and deliberateness is missing in the evidence of this case. He believes defendant has failed to point to any legitimate interest it was protecting by firing him.

Plaintiff further argues that defendant has failed to demonstrate there was a reasonable, subjective belief he engaged in misconduct. He believes the evidence shows that both Dowell and Struder were convinced that plaintiff was unaware he had not paid for the prescriptions until the day he was terminated. Finally, plaintiff points to his educational background and his work

19

performance at CVS to support his contention that he was qualified for his position as pharmacy technician.

Plaintiff takes issue with the defendant's suggestion that he must show the reason given for his termination was false, that discrimination was the actual reason for his termination, or that the reasons given by CVS actually were pretextual. Instead, plaintiff contends that he need only produce enough evidence upon which a reasonable trier of fact could find defendant's proffered explanation for the termination is not credible.

While plaintiff believes there is direct evidence of discrimination, thus obviating the need to rely on the McDonnell-Douglas proof scheme, he reminds the court that he need not exclude all other reasons proffered by defendant, so long as there is evidence to show his disability played a part in his termination. Thus, plaintiff argues he has established a *prima facie* case of disability-based discrimination. Essentially, plaintiff takes the position that defendant's stated reason for terminating him is at odds with what he believes is evidence of disparate treatment as follows: other employees who consumed merchandise prior to paying for it were not discharged; other employees who were terminated for theft were not subjected to medical scrutiny; cashiers were blamed for a customer's failure to pay for prescriptions; and other employees who were terminated were not denied access to COBRA coverage for their prescription medications. Plaintiff also believes there is a genuine issue of material fact as to who in the CVS chain of authority ultimately made the decision to terminate him.

**ADA Confidentiality Claim**

*Defendant*

20

Defendant offers that plaintiff failed to exhaust his administrative remedies as to this claim because it was not included in the charge of discrimination he filed with the EEOC and because it neither reasonably relates to the original complaint nor was it developed during a reasonable investigation of the complaint while the case was before the EEOC.

Defendant believes plaintiff's EEOC charge sets forth only allegations that he was subjected to a discriminatory discharge, and that CVS failed to accommodate him in violation of the ADA. Defendant notes that plaintiff's EEOC charge does not offer a hint of any claim that defendant provided ChoicePoint with confidential medical information or otherwise violated the confidentiality provisions of the ADA.

Defendant further argues, as a matter of law, that the disclosure of plaintiff's admission statement to ChoicePoint did not violate the confidentiality provisions of the ADA because there is no dispute that the information contained in plaintiff's statement was not obtained under 42 U.S.C. § 12112(d)(4)(B) or otherwise covered by the ADA. In sum, defendant argues that Struder's inquiry of plaintiff was neither a disability-related inquiry, because it was not likely to elicit information about a disability, nor was it an inquiry into plaintiff's ability to perform his job under § 12112(d)(4)(B). Instead, the investigation was entirely job-related, centered on plaintiff's non-payment for prescription drugs, and all questions posed related solely to determining whether plaintiff had violated company policy by taking the two prescriptions from the store on the date in question, and if so, whether he had paid for them. According to defendant, the inquiry related to non-payment of prescription medications, and without more, is an inquiry excluded from the protections of the confidentiality provisions of the statute.

21

Because the statement was not obtained in an inquiry covered by the ADA, defendant does not believe it was required to maintain the statement as a confidential record under the ADA. Moreover, defendant contends that, as a matter of fact, the admission statement was disclosed *only* to ChoicePoint, and that its actual content was *not* shared with Lowe's or any other company.

Finally, defendant argues that plaintiff cannot show that disclosure of the admission statement caused him any actual injury. Specifically, defendant notes that plaintiff has alleged injury because Lowe's did not hire him. Yet, there is no evidence in the record showing that Lowe's received a copy of the signed admission statement. Thus, defendant concludes that plaintiff has failed to show that Lowe's decision not to hire him is related to defendant's disclosure of the admission statement to ChoicePoint, or that the disclosure was protected under the ADA.

*Plaintiff*

At the outset, plaintiff notes that in order to sustain his claim that his rights under the confidentiality provisions of the ADA were violated, he need not show that he, in fact, suffers a condition meeting the definition of a disability under the ADA. He argues that defendant violated the confidentiality provisions of the ADA which preclude inquiries about an employee's disability "unless such examination or inquiry is shown to be job-related and consistent with business necessity." 42 U.S.C. § 12112(d)(4)(A). Plaintiff contends that the actions of Wisor, Dowell, and Struder establish that an inquiry occurred, and defendant has not established that an exception to the ADA's confidentiality provisions is applicable to defendant's disclosure of the statement to ChoicePoint.

22

Plaintiff believes that the information in the admission statement identifying the medications he was taking and his explanation of the side effects he was experiencing from those medications was information protected by the ADA confidentiality provisions. He contends this information was available to subscribers of ChoicePoint's Esteem database, and he argues that there is a factual dispute over whether his admission statement was also provided to Stephen J. Tassinari, Esquire, and Retail Enterprises, third parties involved in the civil collections process.

## Fair Credit Reporting Act Claim

### *Defendant*

Defendant seeks summary judgment under the Fair Credit Report Act because it believes it simply was a furnisher of information under the FCRA. CVS points out that there is no private right of action under § 1681s-2(a) for the alleged provision of inaccurate information to a consumer reporting agency. Also, defendant contends that the FCRA does not require a furnisher to adopt procedures to ensure that the information they report is fair and accurate. Moreover, CVS contends that the information communicated to ChoicePoint does not fit the definition of a protected "consumer report," and was not subject to regulation by the FCRA because it merely summarized facts related to actions surrounding plaintiff's violation of company policy.

Defendant acknowledged during argument that there is a private right of action under § 1681s-2(b). However, defendant contends that there is not one stitch of evidence showing that it was put on notice of any dispute plaintiff had under the FCRA by the consumer reporting agency, namely ChoicePoint. Thus, defendant would have the court conclude that the prerequisite notice is absent and that it should be granted judgment as a matter of law on plaintiff's claim under §

23

1681s-2(a).

*Plaintiff*

Plaintiff entirely failed to address these matters in his pleadings related to summary judgment. At the hearing before the undersigned, however, he argued that CVS intentionally provided information to ChoicePoint regarding the reason for his termination, that those reasons were false and that CVS failed to produce any evidence that it adopted reasonable procedures to ensure that the information provided was both fair and accurate.

## FINDINGS, CONCLUSIONS AND RECOMMENDATIONS

### Americans With Disabilities Act

### ADA Discrimination Claim

The first question the presiding court must address is whether plaintiff suffered a disability encompassed by the ADA, and for the undersigned it boils down to determining whether plaintiff's impairments were more like those in *Otting* or those in *Sara Lee*. If more like the former, then plaintiff has established a protected disability, but if more like the latter, then plaintiff has failed to establish that he suffered a disability under the ADA.

The evidence before the court concerning the limitations imposed on plaintiff's major life activities by his epilepsy shows that he is unable to drive and unable to take a bath without someone else being present. He also has asserted that his ability to think and concentrate were impaired during the relevant period. Finding that the facts of this case more closely approximate those of *Sara Lee* rather than those in *Otting*, the undersigned concludes, even in a light most favorable to the plaintiff, that plaintiff has failed to establish that his major life activities are

24

limited to the extent contemplated by the ADA. Therefore, the undersigned concludes that, during the relevant period, he was not under a disability.[14]

In addition, the undersigned concludes, as a matter of law, that CVS did not violate the ADA by failing to make reasonable accommodation for plaintiff. It is difficult to fathom how an employer would be entitled to honor its loss prevention and employee disciplinary policies under the facts of this case and accommodate plaintiff at the same time without essentially ignoring the undisputed evidence that plaintiff walked out of its pharmacy not having paid for the regulated drugs. Neither the ADA nor the applicable decisional authorities appear to put an employer in the position of making such a Hobson's choice between enforcing a legitimate business policy, here an anti-theft policy, and risking suit, or waiving the benefit of that policy and returning the employee to work under the circumstances where, as here, the employer had afforded the employee more than a reasonable time in which to acknowledge the undisputed facts and reimburse the employer for the items for which he did not pay.

Plaintiff's subjective intent, under these circumstance, is not material because a reasonable employer in the same or similar circumstances could conclude that the employee took company product, here highly regulated drugs, without first paying for them. Nor can the examples plaintiff cites in support of the proposition that he was treated disparately support his claim. These variations, even if one were to believe they were variations, are nothing more than random, isolated events and are insufficient to show disparate treatment that may be actionable under the ADA.

---

[14]The undersigned also notes that, as *Sutton* teaches, treatment modalities, namely medications, permitted plaintiff to perform his job with or without accommodation.

25

Should the presiding District Judge determine that plaintiff did suffer a disability at the time, the undersigned, alternatively, notes that there is no direct evidence of discrimination and finds that plaintiff has not produced circumstantial evidence from which a reasonable jury could infer discrimination. That the object of plaintiff's conduct was prescription medications, alone, does not and cannot under these circumstances, raise an inference of disability-based discrimination. Otherwise, an inference of improper discrimination could attach to every case where a pharmacy employee was discovered having taken drugs for his/her own use without paying for them, thus exposing the pharmacy to liability under the ADA. The undersigned further notes at this point that plaintiff never charged before the EEOC, nor has he alleged in the complaint, that he was regarded as disabled by CVS in violation of the ADA. Plaintiff's contention that an inference can be drawn of impermissible disability-related discrimination from the fact that the medications taken were related to epilepsy, in the undersigned's mind, is bootstrapping of significant proportions.

Moreover, other than plaintiff's own conjecture, the evidence in this case is that the decision to terminate plaintiff was made at a level of the organizational structure above store manager. There is nothing before the court to suggest Dowell made the decision, and apart from the inference plaintiff wishes the court to draw based on the nature of his medications, there is nothing to suggest that the defendant's corporate decision was made for reasons other than the fact that plaintiff violated a company loss prevention policy and did not take steps within a reasonable time to acknowledge the undisputed facts relating to his conduct or reimburse CVS for the loss suffered as a result of that conduct, or both.

In arriving at this conclusion, the undersigned is not unmindful that plaintiff has proffered

26

what he believes is expert evidence from James Wilt dispelling the legitimacy of CVS' investigation in plaintiff's case. Plaintiff offers this as circumstantial evidence upon which a jury could find both that plaintiff was meeting his employer's legitimate expectations and that the reason CVS gave for his discharge was pretextual. It is clear that Wilt's opinions are based entirely on what Downie related to him, his review of Downie's complaint in this case and Downie's handwritten statement. (Dkt. No. 114, Ex. C, pp. 1-2.) Wilt revealed he has never been qualified as an expert, has authored no articles on the subject of in-house loss prevention investigations and does not belong to any organizations related to loss prevention. (Dkt. No. 114, Ex. C, p. 2; Wilt's Deposition, pp. 68-69.) His e-mail address is at the firm of plaintiff's counsel. (Wilt's Deposition, p. 13.) His sole experience appears to have been as a polygraph operator in private industry, and this job ceased when Congress passed the Employee Polygraph Protection Act, though he has been working for the law firm representing the plaintiff. (Wilt's Deposition, pp. 33, 70-71.) Wilt does not have any experience working in a drug store or the retail pharmacy field either with CVS or any of its competitors, and the report he furnished was typed by plaintiff's counsel after Wilt had talked with counsel "about the overall problem." (Wilt's Deposition, p. 105.) Wilt's entire opinion was formulated on the information provided to him by plaintiff and was not informed by any evidence relating to CVS' business policies, operation or corporate structure or the circumstances surrounding the events plaintiff offers as comparisons in his disparate treatment claim. (Wilt's Deposition, pp. 117-128.)

In the end, Wilt's evidence is nothing more than an expression of his personal views which are uninformed by all the criteria that would qualify him under the Federal Rules of Evidence as an expert in the field of loss prevention, its techniques and investigations. Fed. R.

Evid. 702-703. Moreover, Wilt's evidence offers an opinion on a subject reserved to the court, namely whether the circumstantial evidence gives rise to an inference of discrimination under the ADA. The undersigned RECOMMENDS that the presiding court GRANT the defendant's motion to strike Wilt's proffered expert evidence because it fails to qualify as such.[15]

The undersigned, therefore, RECOMMENDS that summary judgment enter in favor of CVS and against the plaintiff on plaintiff's claims of discrimination and failure to accommodate under the ADA.

**ADA Confidentiality Claim**

The undersigned is of the view that ADA discrimination and failure to accommodate are distinct claims from that asserted under the so-called confidentiality provisions of the ADA. Certainly, this was not raised as a discrete charge before the EEOC.

Interestingly, plaintiff seemed to have conceded that his confidentiality claim was not specifically addressed in the administrative charged filed with the EEOC, though he now takes an opposite position. Furthermore, the factual allegations set forth in plaintiff's administrative charge do not correspond to his claim that his confidentiality rights under the ADA were violated. To regard them so broadly as to suggest that the confidentiality issues would have arisen as a matter of course during the EEOC investigation appears a stretch to the undersigned.

In the end, the undersigned concludes that plaintiff has failed to exhaust his confidentiality claim. The court is without subject matter jurisdiction to entertain it, and the defendant is entitled

---

[15]The defendant's motion to strike the evidence of Dr. Gould, which relates solely to damages, should be denied as moot because the undersigned is recommending that judgment be entered in favor of the defendant on all of plaintiff's claims. It is so RECOMMENDED.

28

to summary judgment on this claim. It is so RECOMMENDED.

**Virginians With Disabilities Act**

Since plaintiff's rights under the VDA are coextensive with those under the ADA, summary judgment should enter in favor of the defendant on this claim. It is so RECOMMENDED.

**FCRA**

There is no private right of action to enforce the provisions of subsection (a) of § 1681s-2 of the FCRA. Therefore, plaintiff cannot state a claim under this subsection and defendant should be granted summary judgment to the extent plaintiff contends his FCRA claim depends on this subsection.

As to his claim under subsection (b), plaintiff has offered absolutely no evidence to suggest that ChoicePoint, the consumer reporting agency, gave notice to CVS that plaintiff disputed the information CVS provided to ChoicePoint for inclusion in its Esteem database. This is especially telling in light of the evidence CVS has provided the court that it did not receive notice that a dispute existed. (Dan Wagner's Declaration, pp. 1-2; James Lynch's Deposition, p. 13.) In sum, while there may be a private right of enforcement of this FCRA subsection, plaintiff must produce evidence that the defendant had notice for his FCRA claim to withstand summary judgment. He has failed to do so.

Therefore, it is RECOMMENDED that defendant's motion for summary judgment be GRANTED on the entirety of plaintiff's FCRA claim.

**SUMMARY**

For the foregoing reasons, the undersigned hereby RECOMMENDS that an order enter GRANTING defendant's motion to strike the evidence offered by James Wilt while DENYING, as moot, the motion to strike the damage evidence offered by Liza Gould, M.D., GRANTING the defendant's motion for summary judgment on all claims and DISMISSING this action from the docket of the court.

The Clerk is directed immediately to transmit the record in this case to the presiding District Judge. Both sides are reminded that, pursuant to Rule 72(b), they are entitled to note objections, if any they may have, to this Report and Recommendation within ten (10) days hereof. Any adjudication of fact or conclusion of law rendered herein by the undersigned not specifically objected to within the period prescribed by law may become conclusive upon the parties. Failure to file specific objections pursuant to 28 U.S.C. § 636(b)(1)(C) as to factual recitations or findings as well as to the conclusions reached by the undersigned may be construed by any reviewing court as a waiver of such objection.

The Clerk of the Court hereby is directed to send a certified copy of this Report and Recommendation to all counsel of record.

ENTERED: _____

United States Magistrate Judge

6-19-06

Date

30